## AMOS HARDY *vs.* PHINEAS NORTON.

A promissory note is not void because delivered with the payee's name in blank.

The court may allow the jury to take out with them any papers which have been given in evidence, for the purpose of inspecting the same and comparing signatures.

Upon an issue as to the genuineness of the defendant's signature, several papers were shown to him in such manner that he could only see the signatures, and he was asked if the signatures were his. Then the whole of the papers were shown him, and he was asked the same questions. *Held* that it lay in the discretion of the court to allow such a method of cross-examination.

The privilege of cross-examination, *it seems,* is limited only by the discretion of the judge, until there is an abuse of that discretion.

THIS action was originally brought in a justice's court, in Essex county, where the defendant recovered a judgment for costs. From this judgment there was an appeal to the county court, where the action was tried before a jury, and a verdict and judgment rendered in favor of the plaintiff, for $200, beside costs, and from this judgment an appeal was brought to this court.

The action was brought upon a promissory note for $200, alleged to have been made by the defendant Norton and one Timothy S. Nash. Nash was not served with process, and did not appear. Norton's defence to the note was that it was a forgery. The form of the note was as follows: "One year after date, for value received, we jointly and severally promise to pay to Amos Hardy or order, two hundred dollars with interest." Signed, "T. S. Nash, Phineas Norton." The other material facts will appear in the opinion.

*Hale & Smith,* for the plaintiff.

*A. C. Hand,* for the defendant.

P. POTTER, J. A material fact in the case was the genuineness of the signature of the defendant to the note. Upon this question there was sufficient evidence to sus-

Hardy *v.* Norton.

tain the verdict of the jury, and it was a question of conflict. The questions, besides this, to be reviewed are, principally, questions of law, arising upon the rulings of the judge on the trial, and upon his charge and refusals to charge the jury. The first objection was made, when the note was offered in evidence. Seven witnesses acquainted with the defendant's handwriting had given their opinions that the signature was genuine. The objection then raised was that the payee's name was written in different ink, and that the plaintiff was called upon to explain. This was overruled; and as the note is not before us, and as, at that time, there was no evidence on the subject of the ink, we cannot say that the ruling to admit the note in evidence was error. The plaintiff then rested, and the defendant moved for a nonsuit, on the ground of improperly admitting the note in evidence. This was denied, and, so far as we can see, as the case then stood, properly denied. The defendant was then sworn, himself, and testified that he did not write his name on this paper, and upon his cross-examination, testified: "I guess I can distinguish my signature whenever I see it." The counsel for the plaintiff then exhibited to the defendant a signature purporting to be his, the paper on which it was written being inserted in a large envelope, with a hole cut sufficiently large to disclose the signature, but concealing the residue of the paper, and then inquired of him, "Is that your signature?" This question was objected to, 1st. As immaterial; 2d. Whole paper should be shown witness. Overruled and exception. Answer, "I should think it was; cannot swear positively." Paper marked B by the court. In like manner another signature was shown him. The same objections, the same ruling and exception; and the answer was: "I think it is not my signature, but it looks like my writing; I can't swear whether it is or not." Marked C. In like manner, signature to paper marked D was shown him, and the answer was:

Hardy *v.* Norton.

"I should think it was, it may be." Four other papers in like manner, marked E, F, G, H, were shown him, and he answered, "he could not swear positively, but thought the signatures were *not* his." In each case the same objections were made. Then the signature to the note in suit was shown him, in the same way, with the same objections, ruling and exception; and he answered, "it had the same appearance, but he did not think it was his." The signature to paper C was again shown him, and he answered, "he could not swear positively whether it was his; that it had the same appearance, but he did not think it was his." Then the whole of paper B was shown him, and he then answered that he thought the signature was his. Then the whole of the papers C, D, E, F, G and H were shown him, and in each case he answered he had no doubt the signatures were his; that he remembered the circumstance of signing them. The objection to this method of examination, it is urged, by the defendant's counsel, is unprecedented, unjust and unfair. It is insisted that showing a signature through a narrow slit in a large envelope, gives it an unnatural appearance, unfair and confusing to the witness; that it was a trap calculated to prejudice the jury against the defendant, by his happening to fail of recognizing his true signature, or by admitting the signature in question.

At the time these objections were raised, the papers in question had not been offered in evidence, nor was the object of the questions inquired into by the defendant's counsel. The plaintiff was then upon the cross-examination of the defendant, who had been offered as a witness. The privilege of cross-examination, it seems, is limited only by the discretion of the judge, until there is an abuse of that discretion. *Peake*, in his treatise on evidence, says: "It is impossible to lay down a rule on this subject applicable to all cases, and therefore it must be left wholly to the discretion of the judge, who,

in general, is guided by the demeanor of the witness, and the situation he stands in, with relation to the parties." (*Pp.* 189, 190.) *Pothier*, in his treatise, says: "The cross-examination of witnesses adduced by the opposite party, is a subject of the utmost nicety, with respect both to the conduct of the advocate and the discrimination of those who are to form a judgment." * * "The abuses to which this procedure is liable are the subject of very frequent complaint, but it would be impossible, by any *general rules*, to apply a preventive to · these abuses, without destroying the *liberty* upon which the benefits (above adverted to) essentially depend; and all that can be effected by the interposition of the court, is a discouragement of any virulence towards the witnesses, which is not justified by the nature of the cause," &c. * * "Whatever can elicit the actual dispositions of the witness with respect to the event; whatever can detect the operation of a concerted plan of testimony, or bring to light the incidental facts and circumstances that the witness may be supposed to have suppressed; in short, whatever may be expected fairly to promote the real manifestation of the merits of the cause is not only justifiable, but meritorious." (*Vol.* 2, *pp.* 233, 234.) *Starkie*, in his treatise, says: "When a witness has been examined in chief, the adverse party is at liberty to cross-examine him. The power and opportunity to cross-examine, it will be recollected, is one of the principal tests which the law has devised for the ascertainment of truth, and this is certainly a most efficacious test. By this means the situation of the witness with respect to the parties, and the subject of litigation; his intent, his motives, his inclinations and prejudices, his means of obtaining a correct and certain knowledge of the facts to which he bears testimony; the manner in which he has used those means; his powers of discerning facts, and his capacity for retaining and describing them, are fully investigated and ascertained, and sub-

Hardy *v.* Norton.

mitted to the consideration of the jury," &c. (*Vol.* 1, 186.) "The mode of examination is, in truth, regulated by the discretion of the court, according to the disposition and temper of the witness." (*Id.* 187.) See also *Phillips' Evidence,* (*Cowen & H. Notes, by Edwards, vol.* 2, 750,) where it is said: "The power of cross-examination is generally allowed, to afford one of the best securities against incomplete, garbled or false evidence; great latitude, therefore, is allowed in the mode of putting questions."

In *Wentworth* v. *Buhler,* (3 *E. D. Smith,* 309,) a point was made that the witness, on cross-examination, had been asked irrelevant questions. Woodruff, J., says: "True, the evidence was not relevant to the issue, but that is no test for a cross-examination, if it was relevant to the credibility of the witness or any collateral matter opened by the adverse party. The latitude given to cross-examination is such, moreover, that we must be fully satisfied that injustice is caused by it, before we would reverse a judgment because on cross-examination a purely irrelevant question was allowed." (*See Plato* v. *Kelly,* 16 *Abb. Pr.* 188; *Great Western Turnpike* v. *Loomis,* 32 *N. Y.* 127.) I have come to the conclusion, upon these authorities, that the ruling of the judge below may be sustained upon the ground that the examination of the witness, who was also the party defendant, was in a mode, though unusual and trying, calculated to test his knowledge of his own signature to the note in suit. He had testified that, "he did not write his name on that paper;" and added: "I guess I can distinguish my signature whenever I see it." Nothing was better calculated to invite the experiment and to test the truth of his remark than the mode adopted. Though it was unusual and severe, yet the jury were competent to judge of this, and to make due allowance of a mode of examination somewhat calculated to confuse, and deceive the witness. If great liberality is ever allowed on

cross-examination, it is when a party, deeply interested in the result offers himself as a witness; and especially when he has declared that he can distinguish his own signature when he saw it. If he could really do this, he could recognize it by its own expression, or its own peculiar character, unaided by the knowledge of the paper to which it was attached. If his knowledge of his own signature could only be told by him by the extrinsic aid of the instrument to which it was attached, then he could not, as he declared in general terms, distinguish it when he saw it. It must be remembered that at the time of this ruling of the judge to allow this mode of examination, the papers upon which these signatures appeared had not been offered in evidence. Except the note in suit, they had been only used to test the knowledge of the witness as to his own signature. This was not error. The rule laid down in the books is this: If the counsel for a party, by the cross-examination of a witness, obtain proof of the adverse party's handwriting to a paper shown to a witness, the counsel for the opposite party has no right to see the paper for the purpose of examining the witness as to the paper being, as alleged, the handwriting of his client. By proving such a paper, or document, on the cross-examination of a witness, the party proving it is not compelled to put it in evidence, until he enters upon his own case. But if the answers are such as may have an effect, the opposite counsel has a right to see the paper, and to re-examine upon it. (2 *Phil. Ev., Cowen & H. Notes, Edw. ed.* 759. *Russell* v. *Rider*, 6 *Car. & P.* 416.) The plaintiff did not, then, offer these papers containing the defendant's signature in evidence, and the defendant, having admitted the genuineness of most of them when the whole papers were shown, the defendant's counsel made no request to examine in relation to them. I do not think we can hold, in this case, under the circumstances

Hardy *v.* Norton.

shown, that the mode of examination of the defendant as to the signature in question was error. .

Another point raised by the defendant is, that the note in question, if signed by the defendant Norton, was void. That when the plaintiff first saw it, and it was . proposed to be negotiated to him, there was no name of a payee inserted in it; that Nash, the first named maker, who negotiated the note, filled it up in the plaintiff's presence, by inserting the plaintiff's name, as payee. The evidence in the case shows, that in the note in question, when presented to the plaintiff, the payee's name was in blank, and the plaintiff's name was filled in by Nash, one of the makers, at the plaintiff's house. There are cases to be found in the books, principally English cases, which hold that a note without a payee, is mere waste paper. (*Gibson* v. *Minet*, 1 *H. Black.* 608–9. *Storm* v. *Sterling*, 3 *Ellis & Black.* 832.) And these cases are cited in American authorities. (*Edwards on Bills*, 131. *Chitty on Bills*, 156.) And in Massachusetts, a writing in form thus, "*Good for* —— *dollars on demand*," "*A. B.*," was held to be void, unless supported by evidence of some subsisting connection between the parties, from which a promise might be inferred. (*Brown* v. *Gilman*, 13 *Mass.* 158.) And it may be said that here the general rule is, that if a note be payable otherwise than to bearer, it must contain the name of a payee. (*Edw. on Bills*, 131. *Bayley on Bills*, 22.) But this rule has its exceptions. Even now, in England, it is settled that if a bill be drawn and negotiated, and a blank left for the name of the payee, a *bona fide* holder may fill it up with his own name, and recover against the drawer. (*Cruchley* v. *Clarance*, 2 *M. & Sel.* 90, 91.) Lord Ellenborough, Ch. J., said in this case: "As the defendant has chosen to send the . bill into the world in this form, the world ought not to be deceived by his acts. The defendant, by leaving a blank, undertook to be answerable for it when filled up

in the shape of a bill." (*See also Usher* v. *Dauncey*, 4 *Campb.* 97. *Crutchly* v. *Mann*, 5 *Taunt.* 529, 532.) Such is also the American authority. (*Story on Prom. Notes*, § 37. 3 *Kent's Com.* 77. *Mitchell* v. *Culver*, 7 *Cowen*, 336, *and note. Kitchen* v. *Place*, 41 *Barb.* 465. *Bruce* v. *Westcott*, 3 *id.* 374.) Nor is the note void on the ground that it was altered after it was signed by the defendant. It is true, as a settled question of law, that after an instrument *is completed and delivered*, any material alteration that is made without the consent of parties, renders the instrument void. Even in the hands of a *bona fide* holder, an alteration even to make the instrument negotiable, would have this effect. But, *in an imperfect or incomplete instrument*, where a blank space is left to be filled in order to make it complete, and the maker signs and passes it off in that state, the law *implies* an authority from the maker, to the party to whom it is so delivered, to fill the blank; and implies an undertaking to pay the obligation when so completed. If this is not so, as a question of law, the defendant cannot complain in *this* case. He did not ask to have a ruling of the court to the contrary; but he did ask the court to charge the jury, that even if they believed that the signature of the defendant Norton on the note was genuine, the plaintiff could not recover, unless they were satisfied from the evidence that Norton authorized Nash to insert the name of the plaintiff as payee, or had given him general authority to insert the name of payee therein. The judge did so charge; though with a qualification which raises a different question, not material upon this point. The finding of the jury is to be regarded as conclusive upon this point, as there was evidence to sustain it. The qualification made by the judge was this: "that Norton's delivering the note to Nash with the name of the payee blank, with proof that Nash before had, and negotiated a note in blank signed by Norton, might be regarded as sufficient evidence of authority." This was

Hardy *v*. Norton.

a fact, proved by the defendant himself.   I do not think this qualification was error.   I think the evidence sufficient without it to sustain the finding; it was the stronger with it.   There was also evidence that the defendant had been informed by plaintiff of his holding it, and defendant made no denial of his liability; did not set up the question of a forgery; that it was not error, on cross-examination, to ask the defendant, as a witness, his opinion as to the signatures to the seven several papers, marked "B" to "H" inclusive, in order to test his knowledge of his own handwriting, even though no part of the paper but the signature was exhibited.   True, the judge might in his discretion have refused to receive this evidence; and had it been offered with the design and expressed object of using these signatures for the purpose of comparison only, it would have been his duty to have excluded the evidence.   No such object was avowed, and the objection was based on no such ground.   But these papers were not put in evidence; they were only used for the purpose above indicated.

The papers taken by the jury had been used in evidence.   The note upon which the action was brought, I think it is clear, was proper to go to the jury.   It seems to be necessary to examine the circumstances under which the papers "S" and "5" were made evidence. On one of the cross-examinations of the defendant he stated that he had signed a joint note, signed by Nash & Hull, payable to D. B. Stickney, for $100, which he signed.   He then added: "Nash said if I can't get the money of Stickney, I'll make a note, and not date it, and leave the receiver blank; I hesitated but finally signed it; thinks this was in 1863; Nash's name was not on it when I signed."   (This, it is presumed, means the blank note, as will appear from what follows:) "I took up the note and gave a new one for it.   The note was procured and marked "S."   The plaintiff then offered the note "S" in evidence; objected to by

defendant as immaterial and incompetent, objection overruled and exception. The following is a copy of S: "One year after date, for value received, we jointly and severally promise to pay to D. B. Stickney or bearer, one hundred dollars with interest. Dated Sept. 23, 1863," Signed "T. S. Nash, Phineas Norton." It will be seen that Hull's name is not on the note. It must therefore be the blank note which was then produced. Here, then, was not only a genuine signature of the defendant proved, but also evidence by the same instrument, tending to prove license or authority to Nash, to fill up blanks in notes signed by defendant with the name of a payee. I am not able to say that this evidence was inadmissible. This was the note introduced by the plaintiff. The note introduced by the defendant was on a further direct examination by himself. This the defendant states, was the only note he ever signed with Hull, payable to Stickney. The court marked this note "5." A copy is not given.

The material question then, in this case, is: Was it error in the judge to allow the jury to take these two notes marked "S" and "5," with the note on which the action was brought, into the jury room, for the purpose of inspecting the same, and comparing signatures?

The real issues in this case are: 1st, the genuineness of the signature of the defendant to the note in suit; and 2d, whether Nash, one of the makers of the note, was authorized to fill in the blank with the name of the payee. The defendant's counsel urge with great force, that the permission to the jury, to take these notes, "S" and "5," for comparison of signatures, although they had been used in evidence for another purpose, was error; and they rely upon the case of the *Bank of the Commonwealth* v. *Mudgett* (44 *N. Y.* 524) to sustain this position. The cases can easily be distinguished. In that case, like the present, the signature of the defendant was denied. In that case the *defendant*

offered signatures upon checks purporting to be his own, it was claimed, *not* for the purpose of comparison, or for exhibition to the jury, but to test the knowledge and accuracy of the witnesses. The court refused to allow the inquiry, and this ruling was sustained. The Court of Appeals say, such an inquiry could be no test, unless other witnesses were also called to prove their genuineness. Such a proceeding would involve the trial of an issue collateral to the main question. If witnesses pronounced these checks genuine, the evidence would either be immaterial, or would then degenerate into a comparison of signatures, and perhaps to their exhibition to jurors not expert in handwriting. If, on the contrary, the witnesses said they were not genuine, it would be inadmissible to contradict them on that collateral issue. This is a well established and a sound rule, as far as it goes, but it is not all of the rule upon which this case depends. The remainder of the rule is laid down in *Van Wyck* v. *McIntosh*, (14 *N. Y.* 442,) as follows: "The true rule, I apprehend, on this subject, is that laid down in *Doe* v. *Newton*, (5 *Adol. & Ellis*, 514;) that where different instruments are properly in evidence for other purposes, the handwriting of such instruments may be compared by the jury, and the genuineness or simulation of the handwriting be inferred from such comparison. But other instruments or signatures cannot be introduced for that purpose." This rule was confirmed in *Griffits* v. *Ivery*, (11 *Adol. & Ellis*, 322.) It follows, I think, that the only remaining question in this case is, whether the notes marked "S" and "5" in the case, were properly received in evidence for any legitimate purpose. If they were, they are brought within the case of *Van Wyck* v. *McIntosh*, (*supra*.) If they were not so properly received, the judgment should be reversed. The note in the action was properly before the jury. The note marked "5" was introduced in evidence by the defendant apparently for the purpose of

identifying it as being the only note he had ever signed with Hull payable to Stickney; and it would seem in order to contradict the theory in the case, that he had signed more than one. However that may be, or whatever the object, it was introduced by him without objection, as evidence, as being his own genuine signature, and as to which no issue, collateral or otherwise, could be raised. I think he was estopped from denying that it was properly in evidence in the case for some other purpose than for the identification of the handwriting. The defendant himself also produced the note marked "S" in court, and had it marked, but did not offer it in evidence. It was called for by the plaintiff. He testified, however, to having signed it; and, that at the same date, he signed another note for Nash, in blank, as to receiver (probably payee.) If this testimony was not material to the defendant, it does seem to be quite material to the plaintiff's case. It was evidence of the defendant's habit, not only of signing notes with Nash, upon request, but notes in blank, in part, to be filled up by Nash. And inasmuch as it was the theory of the plaintiff that the defendant had signed more than one note with the name of Nash on it, to Stickney, the identification of this note was material to that theory. In a later stage of the trial it appears that the plaintiff recalled the defendant, and proved by him that Hull, Nash and himself, did give another note to Stickney. I am not therefore able to see that the note marked "S" was improperly admitted in evidence; and it was the conceded, uncontradicted, genuine signature of the defendant. This being so, all the three notes given to the jury were properly in evidence for other purposes than for mere comparison. And, within the case of *Van Wyck* v. *McIntosh*, the signatures of the said two genuine notes might be compared by the jury with the signature of the note in suit. In the case of *Howland* v. *Willetts*, (9 *N. Y.* 175,) it was said by Mason, J., and concurred

in by a majority of the court, as. follows : "I have examined with some care the reports of Westminster Hall, as well as of this state, and have not been able to find a case where the courts have set aside a verdict when the jury have, by direction of the court, been permitted to take to their room a paper which had been given in evidence in the cause." This case has some sharp points, but upon the whole·view, I cannot find a good reason for a reversal of the judgment.

PARKER, J., concurred.

MILLER, J., dissented.

Judgment affirmed.

[THIRD DEPARTMENT, GENERAL TERM, Albany, March 5, 1873. *Miller, P. Potter* and *Parker*, Justices.]